Anthony DELLA PIETRA; Eugene Della Pietra; Margot Kennedy; and B-T Productions, Inc., Plaintiffs,

v.

NEW YORK STATE ORGANIZED CRIME TASK FORCE; Herbert J. Lewis; John Mansour; Barry C. Tuttle; and Hon. Culver K. Barr, Defendants.

No. CIV-76-376E.

United States District Court,
W.D. New York.

March 19, 1986.

James M. Hartman, Rochester, N.Y., for plaintiffs.

Bruce E. Hanson, Robert C. Hirsch and Richard S. Mayberry, Rochester, N.Y., for defendants.

### MEMORANDUM

ELFVIN, District Judge.

This is an action arising under 42 U.S.C. § 1983 to recover money damages for injuries sustained as the result of an allegedly unconstitutional search of residential and business premises by agents of the New York State Organized Crime Task Force ("the Task Force"). Defendant Tuttle, against whom the case was dismissed upon his motion for a directed verdict, now moves for an award of attorney's fees, costs and disbursements.

The facts in this case, having been substantially developed during a two-week jury trial, are not in dispute. Plaintiff Anthony Della Pietra and Tuttle were officers and shareholders of B–T Productions, Inc., a corporation which owned the Town and Country Dinner Theatre in East Rochester, N.Y. Various disputes arose between the two with Tuttle suspecting that Anthony Della Pietra was illegally removing funds from the corporation. Tuttle accordingly contacted the Monroe County (N.Y.) District Attorney's Office and was referred to the Task Force, with which defendants Herbert J. Lewis and John Mansour were then employed and which then began an investigation into Tuttle's allegations.[1]

Pursuant to this investigation the Task Force sought and obtained from Monroe County (N.Y.) Judge Culver K. Barr search warrants to search the business premises of B–T Productions, Inc. and the residential premises of plaintiff Kennedy. On August 11, 1976 approximately twenty agents of the Task Force entered said business's premises, conducted an eight-hour search and seized various business records. The plaintiffs immediately challenged the validity of the search, and it was subsequently determined that the Task Force had exceeded its authority in seeking the search warrants in the circumstances extant. Accordingly, the search warrants were vacated and the records seized were ordered returned to the plaintiffs. *See B.T. Productions, Inc. v. Barr*, 54 A.D.2d 315, 388 N.Y.S.2d 483 (4th Dept.1976), *aff'd*, 44 N.Y.2d 226, 405 N.Y.S.2d 9, 376 N.E.2d 171 (1978).

This suit then was instituted against the Task Force, Lewis, Mansour and Tuttle seeking to recover damages for injuries allegedly sustained as the result of the illegal searches and seizures. The Amended Complaint alleged that the defendants had acted under color of state law to deprive the plaintiffs of their rights to be free from unreasonable searches and seizures.

Accordingly, the claim as to Tuttle hinged on their ability to demonstrate that he had been acting under color of state law. The validity of the claims as to Lewis and Monsour in turn depended upon those defendants being able to show that, although acting under color of state law when applying for the invalid search warrants, they so acted in good faith as to be accorded immunity from liability under section 1983.[2]

Prior to trial Mansour and Lewis moved for summary judgment alleging that, notwithstanding the invalidity of the search warrant, the searches of the corporate premises had been consented to by Tuttle in his capacity as its Vice-President, Secretary and fifty-percent shareholder. They argued that, because Tuttle voluntarily signed an explicit consent to search the premises, their actions were not subject to constitutional challenge. In the alternative they contended that they were entitled to qualified immunity as a matter of law. Because of the numerous questions of fact which remained as to the consent of Tuttle and the good faith alleged by Mansour and Lewis, the motions for summary judgment were denied. Tuttle, who had not previously moved to dismiss the claims, did not move for summary judgment.

At the close of the plaintiffs' evidence at the subsequent jury trial, Tuttle, Mansour and Lewis moved to dismiss the Complaint. The basis for the motions by Mansour and Lewis was that sufficient consent by Tuttle had been demonstrated and that good faith had been shown as a result of the uncertainty of New York law in August 1976 concerning the search warrants. Such motion was denied, but their alternative motions to dismiss the plaintiffs' claims for punitive damages were granted due to the failure of plaintiffs to have shown the existence of any requisite malice on the part of Mansour or Lewis.

The basis of Tuttle's motion for a directed verdict was that the plaintiffs had failed

---

**1.** No indictment was returned or prosecution otherwise initiated against Anthony Della Pietra as the result of this investigation.

**2.** The Task Force and Judge Barr were dropped as defendants in this action by a stipulation filed April 26, 1979.

to demonstrate that Tuttle had been acting under color of state law in contacting the Task Force about the corporation's activities and in subsequently aiding its investigation. Because the evidence submitted on behalf of Kennedy, plaintiff Eugene Della Pietra and Anthony Della Pietra failed to demonstrate that Tuttle had been acting under color of state law, Tuttle's motion to dismiss was granted.[3] Tuttle has now moved for an award of attorney's fees, costs and disbursements pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that the plaintiffs had had no basis for a claim against him and that the case was meritless and had been instituted solely to harass him as the result of personal disputes between himself and Anthony Della Pietra.

The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides that "the court, in its discretion, may allow the prevailing party, other then the United States, a reasonable attorney's fee as part of the costs" in federal civil rights actions. A prevailing defendant may recover under section 1988, but only when the lawsuit was vexatious or frivolous or brought to harass or embarrass such defendant. See H.R.Rep. No. 94–1558, 94th Cong., 2d Sess. p. 7 (1976); U.S.Code Cong. & Admin.News 1971, p. 5908; Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980); Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). As noted by the Court in the latter case, "a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation," id. at 421, 98 S.Ct. at 700, or that "the plaintiff continued to litigate after it clearly became so," id. at 422, 98

S.Ct. at 701, even though not brought in subjective bad faith.[4] See Hensley v. Eckerhart, supra, at fn. 2; Harbulak v. County of Suffolk, 654 F.2d 194, 196 (2d Cir. 1981). The Court also opined that "the term 'meritless' is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case, and that the term 'vexatious' in no way implies that plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him." 434 U.S., at 421, 98 S.Ct., at 700. Accordingly, unlike successful plaintiffs who normally recover attorney's fees under section 1988 unless special circumstances would render such award unjust, defendants are seldom awarded such fees. Carrion v. Yeshiva University, 535 F.2d 722, 727 (2d Cir.1976); Turner v. Lynch, 534 F.Supp. 686, 689 (S.D.N.Y.1982).

Without question, Tuttle was a prevailing defendant in this action within the meaning of section 1988. The mere fact that the plaintiffs failed to sustain their claims as to Tuttle, however, does not automatically mean that Tuttle is entitled to an award of attorney's fees. Carrion v. Yeshiva University, supra. The action must be examined from its commencement to its termination to determine whether it was vexatious, frivolous, unreasonable or without foundation or whether the plaintiffs continued to prosecute their claim after it had become clear that it was meritless.

At the outset it must be noted that the plaintiffs' claims, overall, allege a very serious deprivation of an established constitutional right—the right to be free from unreasonable searches and seizures. In order to establish a right to recovery under section 1983 the plaintiffs were required to demonstrate that they had been deprived of

---

**3.** The claims against Lewis and Mansour were subsequently submitted to the jury, which returned a verdict in their favor. Accordingly, a judgment of no cause of action was filed December 9, 1982.

**4.** The purposes therein enunciated governing an award of attorney's fees to prevailing defend-

ants in Title VII actions has been held equally applicable in actions instituted under section 1983. See Hughes v. Rowe, supra, 449 U.S. at 14, 101 S.Ct. at 178. See also People of the State of N.Y. by Abrams v. 11 Cornwell Co., 718 F.2d 22, 25 (en banc) (2d Cir.1983).

a right secured by the Constitution and laws of the United States and that the defendants had deprived them of those rights while acting under color of state law. *Coggins v. Carpenter*, 468 F.Supp. 270, 282 (E.D.Pa.1979). Their claim as to Tuttle particularly hinged on their ability to demonstrate that Tuttle had been acting under color of state law.

■ The record adduced at trial establishes that Tuttle was not then and never had been an "employee" or "agent" of New York State or of the Task Force and that he was a private individual. It is well established, however, that a private person who willfully participates in joint activity or in a conspiracy with a state agent may be deemed to have acted under color of state law for purposes of section 1983. *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156–57, 16 L.Ed.2d 267 (1966); *Fine v. City of New York*, 529 F.2d 70, 74 (2d Cir.1975); *Cerbone v. Westchester*, 508 F.Supp. 780, 784 (S.D.N.Y.1981). Accordingly, the determination whether the plaintiffs' cause of action as to Tuttle was frivolous, unreasonable or without foundation or whether they continued to litigate such action after it became so revolves around Tuttle's relationship with the Task Force.

The Amended Complaint asserts that Tuttle, "upon information and belief, has identified himself publicly as an employee or agent of [the Task Force], and purportedly acted under that authority." Amended Complaint, ¶ 5. It is therein asserted that the Task Force investigated B–T Productions, Inc. and the dinner theatre based upon information furnished by Tuttle and that Tuttle, together with Lewis and Mansour and others, prepared the application for the search warrants. *Id.*, ¶¶ 9, 12. Finally, the plaintiffs alleged that the warrants were based upon hearsay information provided by Tuttle. *Id.*, ¶ 21.

The evidence adduced at trial as to Tuttle's connection with the Task Force was not extensive. Essentially, it was shown that Tuttle had contacted the Task Force concerning the activities at B–T Productions, Inc., that Tuttle had submitted various documents to the Task Force to aid its subsequent investigation, that the Task Force had been unable to conclude that any wrongdoing was occurring based on said documents and that it therefore requested additional documents. The evidence also demonstrates that, upon Tuttle's arrest at the theatre July 10, 1976, he apparently had informed the police that he was gathering information about B–T Productions, Inc. in connection with a pending investigation by the Task Force. The versions of Tuttle's explanations vary. Tuttle stated in an examination before trial[5] that he had never stated to anyone that he was an agent or employee of the Task Force. *Deposition of Barry C. Tuttle*, Tr. at 78–79 (May 20, 1981) (filed November 19, 1982).[6] Mansour stated in an examination before trial that he had been informed that Tuttle had been arrested and "that he had claimed that he was employed by or an agent of or something like that * * *." *Deposition of John Mansour*, Tr. at 156 (January 22, 1982) (filed July 23, 1982).

■ Although Tuttle may be characterized as a willful participant to the extent that he had assisted the Task Force in obtaining evidence concerning the corporation's possible violations of state law, he cannot be perceived as "acting under the color of state law" in so doing any more than can an individual who provides police with information that a crime had been or might have been committed. There was no evidence of a "conspiracy" between Tuttle and the Task Force, and it cannot be concluded from the evidence that Tuttle was a willful participant in joint activity with the state for section 1983 purposes. The plaintiffs' allegations as to this point were de-

---

**5.** The plaintiffs did not question Tuttle at trial as to this allegation.

**6.** Tuttle stated that he had been working on an investigation of the dinner theatre and that he

had been a party to the investigation with the Task Force.

void of evidentiary support and hence a review of Tuttle's request for attorney's fees is appropriate.

The plaintiffs' "belief" that Tuttle was an agent or employee of the Task Force arose from, essentially, hearsay declarations. Eugene Della Pietra stated in an examination before trial that he believed Tuttle to be an agent or employee based upon "information relayed to me" by Samuel C. Bussey, Chief of the East Rochester Police Department, and by Donald R. Padgett, a police officer. *Deposition of Eugene F. Della Pietra,* Tr. at 55 (May 20, 1981) (filed November 19, 1982). Anthony Della Pietra similarly claimed at trial that, based upon what Bussey, Padgett and an East Rochester Town Justice had informed him, Tuttle had stated at the time of his arrest that he had been working for the ·Task Force and that there had been "rumors" to that effect.[7]

The plaintiffs subsequently became aware that both Tuttle and the Task Force had completely disavowed the existence of any agency or employment relationship between them. Mansour testified—and there is evidence supporting such testimony—that he had disavowed Tuttle's "agency" or employment with the Task Force from the outset, that Bussey had contacted Mansour shortly after the arrest to inquire whether Tuttle ever worked for the Task Force, that Mansour had informed Bussey that Tuttle had never worked for the Task Force in any capacity and that Mansour subsequently had sent Bussey a letter to that effect. *Deposition of John Mansour, supra,* Tr. at 98; *Deposition of Herbert L. Lewis,* Tr. at 91–95 (January 22, 1982) (filed July 23, 1982). *Affidavit of Anthony Della Pietra in Opposition To Motions for Summary Judgment,* Exhibit F (sworn to June 11, 1982); Defendants' Trial Exhibit # 32 (copy of a July 17, 1976 letter from Mansour to Bussey). Moreover, Exhibit F to Anthony

Della Pietra's June 11, 1982 affidavit clearly indicates that the plaintiffs had been aware of such disavowal prior to trial.

Padgett testified at trial that Tuttle had stated at the time of the arrest that he had been gathering information for the Task Force and that Tuttle had not stated that he was working for or employed with the Task Force. Padgett further stated that he had assumed Tuttle was acting upon a request of the Task Force. Bussey testified at trial that Tuttle had stated on the night of the arrest that he had been gathering information for the Task Force and that, upon contacting Mansour concerning Tuttle's relationship with the Task Force, Bussey had been informed that Tuttle was not employed by the Task Force.

The plaintiffs initially maintained that Tuttle had been an agent or employee of the Task Force and that Tuttle had been representing himself as such to the community at large. They subsequently retreated somewhat from this position and argued at trial that Tuttle had been participating in a joint activity with members of the Task Force. They failed, however, to demonstrate as to any of their claims that Tuttle had been participating in any such joint activity.

The only information the plaintiffs had ever possessed concerning Tuttle's relationship with the Task Force amounted to the hearsay statements by the two police officers and the village justice who had allegedly stated that Tuttle had informed them that he had been gathering information for the Task Force at the time he was arrested at the theatre. The subsequent disavowal by the Task Force was unquestionably communicated to the plaintiffs, and the record is barren of any evidence indicating that Tuttle actually had been an agent or employee of, or engaged in joint activity with, the Task Force at the time the search warrants had been applied for or executed.

---

7. Anthony Della Pietra also apparently acknowledged in a May 19, 1981 examination before trial that he had learned of Tuttle's "agency" status from Padgett, Bussey and Ralph Morabito, a Village Justice. The transcripts of the examination have not, however, been filed in

Court and Tuttle's reliance on unsworn and uncertified copies of pages thereof—*see* Motion for Award of Attorney's Fees, Exhibit F (filed December 21, 1982)—is misplaced. Such copies are devoid of evidentiary value. *See* Fed.R. Civ.P. rule 56(e).

It is thus clear that the plaintiffs knew, or at least should have known, prior to trial that Tuttle was not acting as an agent or employee of the Task Force. Finally, there has never been any evidentiary indication that Tuttle was involved in the search of Kennedy's premises or in the seizure of Eugene Della Pietra's records; thus the only claims against Tuttle alleged by those two plaintiffs were wholly without merit.

Viewing the case as a whole, there is little doubt that the plaintiffs' claims that Tuttle was acting under color of state law and was thus liable under section 1983 emanated from the acrimonious relationship between the parties. Since at least the inception of this case, the plaintiffs' claims as to Tuttle have been tenuous at best, and subsequent development of the case did little, if anything, to bolster such claims. The inclusion of Tuttle as a party in this case until trial commenced was without foundation and was maintained in an effort to harass him. Given the true history of this case and the failure by the plaintiffs to produce any solid evidence linking Tuttle to the Task Force, it is evident that the plaintiffs' claims against Tuttle were groundless and that the plaintiffs continued to assert their claims against him despite his continued informal efforts to be released from the case and despite the lack of a factual basis for their claims.

The plaintiffs assert in affidavits submitted in opposition to the present motion that such fees should be denied because they had asserted their claims in good faith and that they had been advised by counsel that their claims against Tuttle were meritorious. Subjective good faith, however, is not relevant to the determination whether such fees are warranted. *Christiansburg Garment Co. v. EEOC, supra,* 434 U.S. at 421, 98 S.Ct. at 700, *Colucci v. New York Times Co.,* 533 F.Supp. 1011, 1012 (S.D.N.Y.1982).

In a different context Tuttle might be entitled to the entire relief he seeks. He fails, however, to account for the fact that, although the plaintiffs' case as to him was from its inception tenuous at best and was not enhanced by pretrial discovery, Tuttle did not move before trial to dismiss the Complaint or the Amended Complaint or for summary judgment. Although Mansour and Lewis had moved prior to trial to dismiss and then for summary judgment, Tuttle's first challenge to the sufficiency of the plaintiffs' case essentially came only after trial had been commenced—over six years after the filing of the Complaint.

■ Tuttle's attorney seeks to excuse this delay by stating that, "[b]ecause of the conclusory nature of the allegations contained in the Complaint and Amended Complaint which appeared to give rise to a question of fact as to whether defendant Tuttle had provided erroneous information to other defendants who acted with knowledge of the fact that said information was erroneous or in conspiracy with defendant Tuttle, it was not possible to cause the action to be dismissed prior to trial." *Affidavit of Richard S. Mayberry* ¶ 6 (sworn to December 17, 1982). Such reasoning, however, is faulted. Conclusory allegations clearly are insufficient to state a cause of action under section 1983, *Koch v. Yunich,* 533 F.2d 80 (2d Cir.1976), and Tuttle had been free to test the sufficiency of such conclusory allegations upon a motion to dismiss. *Slotnick v. Staviskey,* 560 F.2d 31 (1st Cir.1977), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). Moreover, he was free to engage in discovery both with the plaintiffs and the other defendants to resolve such factual questions and, accordingly, could have tested the sufficiency of the Complaint and Amended Complaint prior to trial by moving for summary judgment. The plaintiffs, at the very least, would have been required, in opposing such motion, to support and substantiate such allegations. *Henzel v. Gerstein,* 608 F.2d 654 (5th Cir.1979); *Hahn v. Sargent,* 523 F.2d 461 (1st Cir. 1975), *cert. denied* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). Given the nature of the relationship between Tuttle and his co-defendants and the extent of the plaintiffs' evidentiary showing at trial of the nature of Tuttle's involvement, it is quite probable that a motion for summary

judgment, properly supported by affidavits or deposition transcripts, would have eliminated any factual or legal questions as to Tuttle's allegedly having acted under the color of state law. He could have thereby prevailed on the merits and obviated the need for a defense at trial. Specifically, he could have obtained discovery concerning the statements alleged to have been made to him to Padgett, Bussey and the village justice, and could have used such discovery to support his motion. Tuttle chose not to take advantage of any of the pretrial steps available to him, however, and instead waited until trial to challenge the plaintiffs' case. Tuttle and his attorney make frequent reference to informal efforts to release Tuttle from the case, but such fail to account for Tuttle's not seeking removal from the case through an appropriate motion or motions.

■ Because the plaintiffs knew or should have known prior to trial that their allegations as to Tuttle were without evidentiary foundation, because they continued nonetheless to press their claims and, in light of the paucity of evidence adduced at trial as to Tuttle's alleged relationship with the Task Force, Tuttle is entitled to an award of attorney's fees. In light of the above circumstances, however, an award of attorney's fees in the full amount sought would be clearly improper.

The assessment and amount of attorney's fees must be fair and reasonable and determined on the facts of each case. *Hensley v. Eckerhart, supra,* noted the acceptance of twelve factors to be considered in determining an award of attorney's fees: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Id.* at fn. 3. The United States Court of Appeals for the Second Circuit, in *Cohen v. West Haven Bd. of Police Com'rs,* 638 F.2d 496 (2nd Cir.1980), has also determined that the relative wealth of the parties may be taken into account, including the plaintiffs' earning capacity, financial resources and ability to pay the award, as well as the financial status of the defendant. *Id.* at 505. *See also Colucci v. New York Times Co., supra,* at 1012–1013.

Here, as in the last-cited case, it would be an exercise in futility to calculate the fee by the "lodestar" procedure suggested in *Cohen.* Anthony Della Pietra and Kennedy aver that their annual income is $24,900, from which the support of themselves and two children must come and from which Anthony Della Pietra pays child support for four children from a previous marriage. Eugene Della Pietra avers that he has an annual income of $34,000. Tuttle, on the other hand, contends that he is in a "much worse" financial condition.

Tuttle's attorney has submitted an affidavit in which he avers that he seeks an award of $15,519.75—$13,873.75 in legal fees, $371.00 in disbursements and $1,275.00 for legal fees paid to a prior counsel.

As noted above, however, an award of this entire amount is inappropriate in light of the nature of the proceedings in this case. Tuttle is entitled to an award of attorney's fees for work performed in preparation for trial but is entitled to nothing for the trial itself and, inasmuch as he did not conduct the referenced pretrial discovery and did not bring pretrial motions to dismiss, I refuse to speculate as to any fees or costs therefor. His attorney seeks an award of fees of $100 per hour, but I believe that an award of $75 per hour for work performed in preparation of this motion and in preparation for trial is more appropriate. Accordingly, Tuttle is entitled to an award of $5,092.50, plus costs and disbursements in the amount of $371.00, or

a total award of $5,463.50.[8] He may have a judgment against the plaintiffs in such amount.

---

8. Nothing is awarded Tuttle to reimburse him for fees paid to a law firm retained earlier in these general controversies.